[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
By complaint dated April 5, 2001, the Plaintiff wife, Virginia D. Raffel, commenced this action seeking a dissolution of marriage, alimony, custody, support, allowance to prosecute and property settlement pursuant to the provisions of § 46b-81 of the Connecticut General Statutes. The Defendant, Gary E. Raffel, a resident of Maryland, received notice of the complaint with pendente lite motions attached by order of notice dated April 5, 2001. He was served in hand by a deputy sheriff of Montgomery, Maryland on April 21, 2001.
The Defendant failed to appear and the Court proceeded with a pendente lite hearing on June 18, 2001. The Court ordered custody of the minor child to the Plaintiff mother subject to reasonable rights of visitation to the Defendant father. The Defendant was further ordered to pay $500.00 per week in unallocated alimony and child support via an Immediate Wage Withholding. The Defendant was also ordered to maintain health insurance for the minor child with unreimbursed and uncovered health care expenses to be divided on a 50/50 basis pursuant to the Connecticut Child Support Guidelines. The order was made without prejudice.
The Defendant was served notice of the above pendente lite order but failed to appear. The matter was set down for trial by the Clerk of the Court for September 26, 2001. The Defendant defaulted for failure to appear with a finding that the Defendant was not a member of the military service. After hearing testimony from the Plaintiff and reviewing the financial affidavit and exhibits, the Court ordered a dissolution of the marriage. The Court further ordered the Defendant to pay $297.00 per week for child support. The Court further ordered the Defendant to pay $203.00 a week of alimony without prejudice. The Court also found the pendente lite arrearage of $5,100.00 subject to credit and correction by the Defendant based upon proof of additional payments to the Plaintiff since the date of the pendente lite orders on June 18, 2001. Orders regarding payment on the arrearage were deferred. Division of unreimbursed medical expenses for the minor child were ordered at 69% by the Defendant, 31% by the Plaintiff in conformance with the Child Support Guidelines. The Defendant was ordered to pay $5,000.00 counsel fees to Plaintiff's counsel within 30 days of receipt of notice of the judgment.
Due to the fact that the Plaintiff was unable to complete pre-trial discovery, the Court bifurcated the issues of property division and further alimony orders to a subsequent trial date. After notice of receipt of the Court's partial judgment, the Defendant hired counsel who CT Page 5425 filed an appearance on October 26, 2001. The parties deposed each other and exchanged pre-trial discovery in February 2002. The matter was set down for trial on the issues of alimony, property settlement, counsel fees, contempt, credit for payments on the arrearage and other motions. Both parties appeared with counsel on March 1, 2002 and March 6, 2002. At the close of testimony on March 6, 2002 the Court found the Defendant in contempt for failure to pay previous orders regarding alimony and child support. The Court ordered the Defendant to pay a purge amount prior to the court trial date of March 27, 2002. The Court further ordered the parties to submit a stipulation as to Plaintiff's liability on any of the debts of the Defendant. The Defendant paid the purge amount in accordance with the Court's order.
On the morning of the trial date of March 27, 2002, the Defendant hired new counsel, who filed an appearance. After hearing, the Court permitted prior counsel of the Defendant to withdraw. The Court further accepted stipulations of the parties relative to liability of the Plaintiff on debts of the Defendant. The Plaintiff attempted to submit an exhibit from an accountant concerning a recalculation of Defendant's income from his medical practice. Said accountant who is located in Maryland was not available for cross examination. After hearing, the trial court denied the Defendant's request to reopen the trial for the purposes of submitting additional evidence on the record.
The Court, after reviewing the tortured procedural history of the above-entitled matter, testimony of the parties and review of the exhibits submitted, the Court makes the following findings of fact. The Plaintiff wife (whose maiden name was Virginia D. Lenkiewicz) married the Defendant husband on May 19, 1981 at Rockville, Maryland. She has resided continuously in the State of Connecticut for one year next preceding the date of the filing of this complaint. All statutory stays have expired. The parties have one minor child who is issue of the marriage: Leah Alexandra Raffel, born July 6, 1984. No other minor children have been born to the Plaintiff wife since the date of the marriage. The court further finds that no state or municipal agency of the State of Connecticut is contributing to support of the parties and/or their child.
The Plaintiff is a 53 year old college graduate. The Plaintiff has performed various jobs since the date of the marriage due to her relocations as a result of the Defendant's pursuit of a medical degree. She has held various medical office positions in Maryland, New York, Guam and the State of Connecticut. The Plaintiff is presently employed as a certified ophthalmic assistant for Dr. Francis Falk in New London County. The Plaintiff enjoyed good physical health until she was diagnosed with a malignant melanoma on her right upper extremity. After CT Page 5426 two surgeries and post-operative treatment the cancer was removed and is in remission. She presently enjoys good physical health.
The Defendant is presently 55 years of age. He graduated from George Washington University in 1978 with a B.A. in speech pathology. He also earned a master's degree in forensic science and obtained a Physician's Assistant certificate in 1979. He has worked in California and Maryland as a physician's assistant for ten years.
The Defendant desired to continue his education and attain a degree in medicine. After conference and agreement with his wife, the Defendant embarked on a long academic journey to reach his dream. He enrolled in college in 1985 and 1986 and completed courses in organic chemistry and psychology. In September 1987 he enrolled in the West Virginia School of Osteopathic Medicine. His medical school training required him to matriculate in West Virginia for a period of two years. The second two years of his education were performed in Ohio, Maryland, Washington, DC and Florida.
Upon completion of medical school, the Defendant chose an osteopathic internship in New Jersey. After discovery of the lesion in the Plaintiff's right arm in 1991, he left the internship in the summer of 1991 to be closer to his wife. He transferred to a medical facility in Providence, Rhode Island, to live closer to his ailing spouse. While working in Providence. he decided to change his specialty. He then transferred his residency to the Franklin Square Hospital in Maryland with a change in specialty to internal medicine.
After discussion with his wife, he decided to enter into a contractual arrangement with the U.S. Navy. While in the Navy, he was stationed with the Plaintiff and their minor child in Guam and later in Groton, Connecticut. After his discharge from the service the Defendant decided to open a medical practice in Maryland where he has been employed as a private physician. In addition to his own medical practice, he has an arrangement with Kaiser Permanente to perform medical services as an independent contractor. The Defendant throughout the course of the marriage and at the present time enjoys good physical health.
The Court concludes that based upon the testimony of the parties and review of the exhibits that both the Plaintiff and the Defendant are working in careers that maximize their present and future earnings and earning potential. Vandal v. Vandal, 31 Conn. App. 561; Bronson v.Bronson, 1 Conn. App. 337 (1984); Venuti v. Venuti, 185 Conn. 156, 161
(1981). The Plaintiff presently enjoys gross weekly wages of $630.00 with a net weekly income of $560.00. The Defendant claims differing amounts of personal income prior to and at trial. The Court concludes that the CT Page 5427 Defendant earns more than the amount reflected on his financial affidavit filed on March 1, 2002 and further will enjoy an increase in income once his fledgling medical practice moves towards maturity.
The Plaintiff and the Defendant were both engaged in employment-related to the medical profession at the time of their marriage on May 19, 1981 at Rockville, Maryland. The Plaintiff was a receptionist in a local doctor's office while the Defendant was employed as a physician's assistant. The parties, during the early part of their marriage, both worked and pooled their funds. The minor child Leah Alexandra Raffel was born on July 6, 1984. She was not a natural issue of the relationship between the parties. The child was placed in the custody of the parties in October of 1984 and was adopted shortly thereafter. The Plaintiff left employment for a period of approximately one and a half years. She returned to employment on a part-time basis as a receptionist/technician working 24 hours per week during the business week. She also has additional hours on Saturdays at the medical office that employed her.
After discussion and consensus, the Defendant embarked upon a journey to enter the medical profession as a licensed physician. The parties initially borrowed $50,000.00 in loans to cover the expenses for the first two years of medical school. In addition, the family home in Maryland was sold with the proceeds from the sale placed in a checking and savings account for rent and household expenses.
The parties agreed that he would go to school and obtain his degree while the Plaintiff cared for the minor child. The Plaintiff was willing to sacrifice so her husband could attain his goal. The parties lived together on this arrangement for the first two years of his medical training. This arrangement was difficult on both parties. During his first year of medical school, the Defendant had second thoughts of whether he should continue in his pursuit of a medical degree. The parties had previously sold their home and were living in a rental unit. The Defendant concluded he had no reasonable choice other than to continue.
Prior to commencing his third year of internship, the family unit was dealt a blow. The Defendant was required to do clinical rotation for the remaining two years of his medical school at different hospitals in different states near the medical school. This resulted in the Plaintiff and minor child's relocation to Binghamton, New York, an area close to her relatives. The separation and lack of adequate funds resulted in the Defendant visiting the Plaintiff and minor child only once every one or two months. Both parties however testified that the marriage was a good and healthy marriage during this period of time. CT Page 5428
The Plaintiff commenced employment at the time of her relocation to Binghamton and earned sufficient money to pay the household expenses. The Defendant, with the little income he received, purchased furniture, paid for vacations and any extra needs of the family. The family existed living in two separate locations during this two-year period of time. Prior to the fifth year of medical education in internship, the Defendant unilaterally chose to relocate to a hospital in New Jersey. The Plaintiff had no role in said decision. She remained in Binghamton with Leah while he moved to New Jersey. The parties further existed under the same financial arrangement referred to above.
The Defendant transferred from New Jersey to Binghamton Hospital to be closer to his wife's home as a result of her cancer diagnosis and subsequent surgical treatment. After completion of the internship in Binghamton, the Defendant was required to contract with a medical institution for purposes of his residency. Although the parties discussed the location of the residency, the Defendant chose to contract with a hospital in Providence, Rhode Island. The Plaintiff wanted to reunite the family in the Providence area but was rejected by the Defendant. He did not feel he would have sufficient time to spend with the Plaintiff and minor child due to the rigors of his profession. The Plaintiff and Leah remained in Binghamton, New York. The Defendant visited them every two or three months and further kept in touch by telephone.
During his residence in Providence, he decided to change his specialty from pathology to internal medicine. As a result of the change in career goals, the Defendant decided to relocate to Baltimore, Maryland. He discussed with his wife the idea of purchasing a home in Maryland where the Plaintiff and Leah would eventually move to upon completion of his medical residency. He again directed the Plaintiff and the minor child not to relocate to Maryland. He concluded that he would be too busy in his medical duties. Further, she had a good job and with the child well adjusted. The Plaintiff, after discussing the matter with the Defendant, acquiesced and remained in Binghamton.
For the three-year period of residency, the parties continued their prior financial arrangements. Her income was utilized to pay the rent and household expenses and he provided whatever support was needed by the wife for incidental expenses. The Plaintiff was making sufficient money as a certified ophthalmic technician to deal with the general family obligations. During this period, the Defendant purchased a home in Maryland placing title in his name alone.
At the end of the Defendant's residency, the Raffel family was left with yet another career choice. After discussions with his wife, the Defendant concluded that he could not get a position in a private medical CT Page 5429 office at that time. He decided to take a commission in the United States Navy rather than enter private practice. While the Plaintiff had misgivings, she acquiesced in her husband's decision. She feared an additional loss of income from four years of private practice, which would have to wait until his completion of his government contract. He convinced her that he should sign on with the Navy and use the naval salary to pay loans of approximately $100,000.00 borrowed for his prior schooling.
After hearing the testimony and weighing the credibility of the parties, the Court concludes that the parties agreed that the $100,000.00 loans would be paid from salary received under contract with the Navy. The Defendant breached that agreement and failed to pay his prior school loans with the naval salary.
The Defendant was assigned to Guam in April of 1996. The Plaintiff and minor child moved in June of 1996 to be finally reunited with the Defendant. The parties resided in a condominium in Guam. While the Defendant was working as a naval physician, the Plaintiff engaged in employment in a private ophthalmologist's office. The minor child was having a difficult time adjusting to a new environment. Her grades suffered as her behavior became anti-social and combative. In 1998 the parties moved to Groton as a result of the Defendant's reassignment. The parties lived in Navy housing. The child's conduct in school continued on a downward slide. Her interaction with her parents and others turned rebellious resulting in her arrest for assisting a co-employee to shoplift.
While stationed in Groton, the Plaintiff began full-time employment with Dr. Falk in September of 1999. The Defendant's student loans were consolidated totaling approximately $200,000.00 including accrued unpaid interest. Both of the salaries of the Plaintiff and Defendant went into the checking account to pay family debts and student loans.
In the early spring of 2000 the family was about to see the light at the end of the tunnel. The Defendant's military commitment terminated on March 15, 2000. Prior to said date, the parties discussed and agreed that the Defendant would open a private practice in the State of Maryland utilizing a vacant office supplied by the Defendant's father. The parties discussed and agreed that the Plaintiff and Leah would join the Defendant in Maryland upon completion of the office remodeling and end of the school year in June. The Plaintiff would assist the Defendant in working as a receptionist and full-time billing clerk in the new medical practice.
The Defendant went to Maryland and commenced remodeling of the office CT Page 5430 utilizing joint funds from the family's accounts in addition to a line of credit negotiated with a banking institution. The Plaintiff went to Maryland and assisted the Defendant in making appointments for equipment suppliers and office furniture. The parties further discussed how to keep costs down in their new business endeavor. The Defendant also contacted the Plaintiff's previous medical employer who agreed to rehire her on a part-time basis.
From the beginning of the marriage through the end of 1999, the Plaintiff consistently believed that she had a good marriage with the Defendant. Although times were rough periodically through the marriage in an economic sense, both parties strived to meet the goals of the Defendant; i.e., completion of medical school training and opening of a private office. Throughout the many periods of separation between the parties, the Plaintiff remained loyal to the Defendant acquiescing in each and every one of his demands and/or wishes concerning the party's separation and his completion of medical profession training. The Plaintiff truly loved the Defendant and stood by him through thick and thin. The Defendant gave no indication to the Plaintiff of any distrust, dissatisfaction or lack of love and affection for the Plaintiff throughout the marriage. The minor child also loved the father and was disappointed each and every time the family was separated. The father in turn did not respond in kind to the minor child which contributed to her childhood difficulties.
The Plaintiff noticed a change in the Defendant's conduct and affection toward her commencing in January, 2000. The Defendant became distant and cold. He, however, directed the Plaintiff to give notice to her employer that she would be leaving while at the same time refusing to discuss the proposed medical practice with the Plaintiff. The Plaintiff again followed the Defendant's directions without question. She contacted her employer and advised him that she would be leaving to assist her husband in all ways she could in his new medical practice in Maryland. The Defendant further made arrangements with the United States Navy to continue the residency of the Plaintiff and minor child in government housing until the middle of June 2000. The Defendant contended that the marriage began breaking down in the late 1980's due to their separation and problems with communication. The Defendant never made any statements to the Plaintiff to confirm this feeling.
The Defendant was to leave to embark on his new career on March 14, 2000. On the day prior to his scheduled departure, the Defendant advised the wife for the first time that he did not love her any more and no longer intended to live with her. He further advised that he was leaving and would not be coming back. He made the above statements within earshot of the minor child. The Defendant left the following morning after CT Page 5431 packing his car without even saying goodbye to his daughter. She has not seen him from the day he left until the late winter of 2002 at his deposition.
The Plaintiff was devastated emotionally as a result of the totally unexpected and uncalled for conduct of the Defendant. The Defendant left Maryland to commence his medical practice without his wife and without even saying goodbye or explaining his position to his daughter. The Plaintiff was left alone to deal with the daughter with her continuing emotional and academic problems.
The Plaintiff was left with the specter of eviction by the military from housing at the time the child graduated from school. Her stay was extended until the end of June with the assistance of the Defendant. Fortunately for the Plaintiff and the minor child, the Plaintiff's employer permitted her to withdraw her resignation and she has continued to work for said doctor on a full-time basis. The Plaintiff was forced to cash in the minor child's savings account held by the Plaintiff, purchase the marital residence listed on her financial affidavit. The Defendant did contact the creditor to remove the Plaintiff's name from the Dodge Durango loan so she could qualify for a mortgage. The Defendant unilaterally determined at the time of his separation that he would make the payment for the Durango with the car insurance and would further send the Plaintiff $300.00 a month for support.
Upon his removal to Maryland, the Defendant supplied the Plaintiff with no explanation as to income or expenses for his medical practice. He further did not advise her that he was moving his paramour to Maryland to live with him. She was the wife of a colleague who was separated and in the throes of a divorce. To add insult to injury, he not only moved in with her but hired her as his full-time medical office director. She is presently receiving a salary in the amount of $40,000.00 per year. She also receives alimony and child support from her ex-husband while residing with her two children and the Defendant.
Upon his removal to Maryland, the Defendant hired legal counsel to commence an April 2000 divorce action in Superior Court, New London County against the Plaintiff. During the pendency of this action, the counsel for the Plaintiff (also counsel in the present case) filed pre-trial discovery motions and made arrangements with counsel for the Plaintiff husband for depositions and answers to interrogatories. Immediately prior to a scheduled pretrial, the Defendant husband fired his counsel and subsequently hired other counsel who withdrew the action at his request in March 2001.
Subsequent to the withdrawal of the Connecticut action, the Defendant CT Page 5432 hired additional counsel in Maryland who filed another legal action against the Plaintiff wife in the State of Maryland. The Plaintiff wife commenced the present action against the Defendant husband after learning of his withdrawal of the first action in Connecticut and subsequent filing in the State of Maryland.
The Court concludes that the Defendant has engaged in conduct from 1999 through the present date to keep his wife at arm's length from any and all of his financial transactions and his extramarital infidelity. The Court concludes that the Plaintiff has been an honest, loving and hardworking partner left alone during a substantial part of the marriage to raise the party's adopted child. The Court further concludes that the Defendant has been manipulating and dishonest in his dealing with his wife prior to their separation. The Court further concludes that the Defendant had an extramarital relationship with his paramour while in Connecticut while residing with his faithful spouse and child. The Court does not find the testimony of the Defendant credible as to his infidelity. The trier of fact is the sole arbiter of the credibility of the witnesses. Christie v. Eager, 129 Conn. 62 (1942). The Defendant's conduct and secretive dealings in Maryland and at home in Connecticut caused the breakdown of the marriage.
The Plaintiff was left with no information as to her husband's business dealings and/or extramarital affairs after the parties separated. She was unaware of the existence of the paramour until the Defendant was deposed early this year. She was unaware that the Defendant had entered into various financial dealings without prior court involvement and/or approval. She was further unaware that his first medical practice in Silver Springs, Maryland was a financial failure. He never advised her as to that he hired his girlfriend to work for his business. The Defendant never advised his daughter that he was residing with his girlfriend's children instead of residing with her.
The Court has a clear picture of the income earning potential and value of the assets held by the Plaintiff. She has worked and carefully managed her living expenses while continuing to raise the parties' only child. On the other hand, the Defendant's financial picture is clouded based upon the limited evidence presented to the Court by the parties. The parties submitted insufficient evidence as to the value of the Defendant's fledgling medical practice. The Defendant (through discovery and at trial) provided recent tax returns and a profit and loss statement blending his income and expenses from his two medical practices, the prior practice in Silver Springs, Internal Medicine (1/1/2001-4/25/2001) and his present practice at Cedar (4/26/2001-1/28/2002) (Defendant's Exhibit 5). The profit and loss statements prepared by the Defendant's accountant was based on an accrual method and therefore does not show CT Page 5433 actual income earned and/or expenses paid for that period. Furthermore, the federal tax return submitted by the Defendant for tax year 2001 does not include a Schedule C (Defendant's Exhibit 4). No corporate tax return, if any, was offered and admitted at trial.
The Defendant testified that he deducts almost all of his expenses, business and personal, through his medical evidence. He resides with his girlfriend who worked for his practice since their inception for no salary until the end of July 2001. He claimed that he was advised by his accountant to pay her a salary which the Defendant set at $40,000.00 per year. The Defendant has not presented evidence establishing the need for an office manager on a full-time basis or the appropriate salary for that position.
The Defendant deducted as business expenses, the following items: (1) total rental for the M-3 BMW operated by him (2) the total rental for the new X-5 BMW used by his girlfriend for personal use and alleged use for elderly patients (3) dining expenses (4) a $240.00 scarf for his girlfriend, Marta Cotterel (5) gifts totaling $3,200.00(6) clothes at Nordstrom and Bloomingdale (7) attorney's fees in his various domestic actions totaling over $7,200.00. At his deposition they changed his income figures on two different occasions. (Plaintiff's Exhibit 8.) At trial, the Defendant testified as one weekly figure for income for Kaiser Permanente which did not coincide with the figure on his financial affidavit under oath.
The Court ordered that the Defendant, through fault of the accountant or his own, has failed to fairly represent his income. The Court finds that the Defendant made a conscious effort to avoid depositions and discovery in the previous and present Connecticut divorce action. He has attempted to lay the blame upon prior counsel and this prior accounting firm for his lack of clarity and understanding as to his actual income and appropriate expenses of his business practices.
The Court finds that the Defendant earns personal income in the amount of $95,000.00 per year after deductions of business expenses. The Court has reviewed his profit and loss statement, tax returns, other exhibits and his testimony in arriving at his present income. The Court concludes that a $20,000.00 deduction for salary for his office manager who is also his girlfriend and a cause of the disintegration of the Raffal family unit is appropriate. The Court further concludes that the Defendant chose to pay his girlfriend $40,000.00 plus a luxury SUV to avoid paying guideline child support and alimony to his present wife.
The Defendant, according to the exhibits and testimony, presently owes substantial debt for previously unpaid student loans and start-up costs CT Page 5434 in purchasing and operating his medical practices. The Defendant has chosen his profession. He failed to pay off his student loans during his Naval duty. He has a substantial future earning capacity, and therefore, he shall pay said debts. The Plaintiff shall pay all of the debts presently owed by her. The Defendant owns and operates his medical practice. The Plaintiff shall not acquire, by the terms of this judgment, any interest in and to said business and its assets and inventory. The Defendant's medical license is also not a marital asset and therefore belongs solely to the Defendant. Simmons v. Simmons, 244 Conn. 158, 169
(1977).
The Court is left with the task of dividing the remaining assets and to determine the amount, if any, of alimony and child support. The Court concludes that the Plaintiff shall keep her home and vehicle free and clear from any claims of the Defendant. The Defendant's conduct in causing the breakdown of the marriage and failure to pay the student loan requires the Court to order the Maryland property to be sold and the proceeds divided equally by the parties.
The Defendant shall pay alimony and child support to the Plaintiff with modification retroactive to November 19, 2000. Child support shall be calculated upon gross weekly income for the Plaintiff in the amount of $630.00 and for the Defendant in the amount of $1,827.00. Said support shall be paid directly to the Plaintiff in that the court concludes that she provide support to the child who is presently residing outside the marital residence, with the support obligations to terminate on July 6, 2002.
As to alimony, the Defendant shall pay periodic alimony to the Plaintiff retroactive to November 19, 2000. The Court has considered all of the statutory factors in Connecticut General Statutes § 46b-82
including, but not limited to, the income and future earning capacity of the parties, length of the marriage, age, health, needs and fault of the parties. Once the support obligation terminates on July 6, 2002, the Defendant's alimony shall increase.
The Court concludes that the Defendant has a capacity to earn substantial more income in the future with the Plaintiff's income to remain the same with the exception of future raises. The Court can review the income status of the parties upon motion filed by either post judgment.[1]
The Court shall have the power to review the financial positions of the parties in the future in determining whether to modify the periodic alimony order. The actions of the defendant leaving his wife behind in Connecticut while embarking on a new career with the potential of CT Page 5435 substantial increases in business and personal income requires the Court to keep alimony open. It would be manifestly unfair to prevent the plaintiff from seeking an increase in alimony when she also worked hard to maintain a home for herself and her daughter. The court must also, however, take into consideration the substantial debt that the defendant must pay to keep his practice viable while he maximizes his business income in the future.
The Court has considered all of the statutory factors concerning custody and visitation as set out in Connecticut General Statutes §46b-56. The Court has also considered all of the factors in Connecticut General Statutes §§ 46b-81, 46b-82 and 46b-84 and other pertinent statutes, tax implication, earning and earning capacity differential, causes for the breakdown of the marriage and the consequences of the financial awards set forth below. The Court, with jurisdiction in this matter, makes the following orders in addition to the dissolution of the marriage and prior child support, alimony and counsel fees orders of September 26, 2001:
1. CUSTODY AND VISITATION WITH MINOR CHILD.
The Plaintiff wife shall continue to have custody of the minor child Leah A. Raffel, born July 6, 1984, with the Defendant husband to have reasonable rights of visitation.
2. SUPPORT OF THE MINOR CHILD.
The Defendant husband shall pay support in the guideline amount of $178.00 per week retroactive to November 19, 2000. The Plaintiff wife shall maintain health insurance as available through her place of employment and the parties shall divide any uncovered or unreimbursed healthcare expenses for the minor child retroactive to November 19, 2000 as follows: Plaintiff wife, 46% and Defendant husband, 54%.
3. ALIMONY.
The Defendant husband shall pay alimony to the wife in the sum of $200.00 per week retroactive to November 19, 2000. Such periodic alimony order shall increase to $400.00 per week effective on the date the minor child attains the age of eighteen, July 6, 2002. Said alimony order shall terminate upon the death of either party or remarriage of the Plaintiff.
The Plaintiff wife shall pay no alimony to the Defendant husband.
4. CALCULATION OF ARREARAGE OWED OR CREDIT DUE FOR CHILD SUPPORT ANDALIMONY AND UNPAID HEALTH CARE EXPENSES FOR THE MINOR CHILD. CT Page 5436
The Plaintiff and Defendant will file child support guidelines consistent with this judgment within two weeks of the date of this judgment. The parties will further file a stipulation as to any arrearages owed or credits due to either party based upon the Court's retroactive modification to November 19, 2000. If the parties do not stipulate to the arrearages and/or credits within four weeks of the date of this judgment, the matter shall be claimed for a short calendar hearing to resolve any dispute. Payment of the child support arrearage shall be at the guideline amount: 20% of the guideline support order until the child reaches majority and 50% per week of the guideline amount thereafter until paid in full. Any credit shall be paid by an equal weekly payment spread over the next 52 weeks. Any alimony arrearage or credit shall be paid by an equal weekly amount spread over the next 52 weeks.
5. REAL PROPERTY.
The Plaintiff wife shall have all right, title and interest in and to her home at 5 Mellon Avenue, Groton, Connecticut free and clear of any claim from the Defendant husband. The Defendant husband shall list the real estate located at 651 Boxwood Drive, Hampstead, Maryland for sale with a mutually agreeable real estate broker at a mutual price. The Defendant shall pay the monthly mortgage, taxes, insurance, utility bills and any and all other expenses on said home until sold. The parties shall divide the net proceeds from the sale of said real property on a 50/50 basis. Net proceeds are defined as the gross sales price minus the sum of the following: closing costs including a reasonable attorney's fee and current mortgage balances. The Court shall retain jurisdiction over this paragraph to ensure that this order is carried out. The Court shall set the price and terms of sale if the parties are unable to agree.
6. CEDAR LANE, LLC, AND MEDICAL PRACTICE ASSETS
The Defendant shall have all right, title and interest in and to his medical practice known as Cedar Lane, LLC including but not limited to stock, bank accounts, inventory, accounts receivable, equipment and automobile leases, etc., free and clear of any claim from the Plaintiff wife.
7. AUTOMOBILES AND AUTOMOBILE LEASES
The parties shall have all right, title and interest in the automobiles and/or automobile leases listed on their financial affidavits filed on March 1, 2001 free and clear of any claim from the other. CT Page 5437
8. BANK ACCOUNTS, IRA, COMPUTER EQUIPMENT
The Plaintiff wife shall have all right, title and interest in and to the computer equipment, bank accounts and First Albany IRA listed on her financial affidavit filed on March 1, 2001.
9. DEBTS
The Defendant husband shall pay and hold the wife harmless from any liability for the debts listed on his financial affidavit filed on March 1, 2002 and any other personal or business debts, mortgage loan and or student loan not listed on his financial affidavit including but not limited to personal debts or business debts incurred by the Silver Spring medical practice, Cedar Lane Medical Center and/or LLC. Said indemnification protecting the Plaintiff wife shall be in the nature of alimony and/or spousal support not dischargeable in bankruptcy. The Court shall retain jurisdiction to carry out the purpose and intent of this paragraph of the judgment.
10. ATTORNEY FEES.
The Defendant husband shall pay attorney's fees to Attorney Lois Lawrence in the amount of $3,000.00 within 180 days of the date of this judgment.
11. TAX RETURNS. PERSONAL AND CORPORATION.
The Plaintiff and Defendant shall provide copies of all personal federal and state income tax returns including all schedules filed therewith (W-2, 1099 Schedule C, etc.,) within seven days of filing with the taxing authority. The Defendant shall further provide copies of all business, partnership and/or corporate taxes returns for any and all entities that he has a legal or equitable interest within seven days of filing the same with the taxing authority. The Defendant shall also provide copies of any and all loan applications signed by him on his own behalf or on behalf of any business partnership and/or corporation in which he has a legal or equitable interest within seven days of filing with the lending authority.
Said obligation to supply the above documents to the other party shall terminate when the defendant's obligation to pay alimony terminates.
Devine, J.